IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **DCT CREEKSIDE I, LLC,** | : | |
| Plaintiff, | : | |
| | : | Case No. 2:09-CV-270 |
| v. | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **DATA EXCHANGE CORPORATION,** | : | Magistrate Judge Kemp |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on Plaintiff DCT Creekside I, LLC's ("DCT") Motion for Partial Summary Judgment on DCT's Complaint and for Summary Judgment on the Counterclaim of Defendant Data Exchange Corporation ("DEX"). (Doc. 17.)[1] For the reasons set forth below, DCT's Motion is **GRANTED in part and DENIED in part**.

### II. BACKGROUND

### A. FACTUAL BACKGROUND

DCT is a limited liability company that is authorized to do business within the State of Ohio. DEX is a California corporation with its principal place of business also located in California.

Creekside I, LLC ("Creekside"), a dissolved Ohio limited liability company, holds title in fee simple to certain real property and improvements located at 5653 Creekside Parkway, Obetz,

---

[1]Also before this Court is DCT's Motion for Leave to File a Supplemental Reply Memorandum in Support of its Motion for Partial Summary Judgment (Doc. 28), which is hereby **DENIED**.

Franklin County, Ohio. This property is registered as Franklin County Auditor's Parcel Numbers 152-001637-80 and 152-001637-90 and is a 274,000 square foot warehouse facility (the "Premises"). DCT is successor-in-interest to Creekside and now holds title in fee simple to the Premises.

On October 30, 2003, DCT, through its predecessor Creekside, and DEX entered into a Lease Agreement (as amended, the "Lease"). Pursuant to the Lease, DEX, as tenant, agreed to lease a portion of the Premises from DCT, as landlord, for a term of 65 months beginning on December 1, 2003, and ending on April 30, 2009.

On April 15, 2004, DCT, through its predecessor Creekside, and DEX entered into an Amendment to the Lease ("Amendment I"). Pursuant to Amendment I, DEX agreed to lease additional portions of the Premises from DCT, and to extend the Lease through June 30, 2010.

On April 6, 2007, DCT and DEX entered into a Second Amendment to the Lease ("Amendment II"). Pursuant to Amendment II, DEX agreed to lease the remaining portions of the Premises from DCT. After the execution of Amendment II, DEX leased the entire Premises from DCT. Most of the terms of the original Lease Agreement were incorporated by reference into Amendment I and Amendment II.

The Lease provides that DEX shall pay DCT a monthly installment of Base Rent,[2] plus

---

[2] Base Rent is a defined term in the Lease, and varies according to the lease period:

| Lease Period | Annual PRSF Base Rent | Annual Base Rent | Monthly Base Rent |
| --- | --- | --- | --- |
| Months 1-3 | $0.00 | $0.00 | $0.00 |
| Months 4-39 | $2.85 | $163,723.95 | $13,643.66 |
| Months 40-65 | $3.00 | $172,341.00 | $14,361.75 |

DEX's proportionate share of the Operating Expenses,[3] and the amortized costs of Tenant Improvements as additional rent by no later than the first day of each month during the Lease term.[4]

DEX paid monthly rent on the premises pursuant to the Lease and remained current through the payment that was due to DCT on January 1, 2009. On January 13, 2009, DEX officials and Creekside officials met at the Premises. According to DEX, "[a]t that meeting DEX stated it was abandoning [the Lease] and that it would not be paying rent past the January 2009 payment that was already made." (Def. Supplemental Memo in Opp. p. 2.) On January 16, 2009,

---

(Am. Complaint Ex. A p. 2.). After Amendment II, the total Base Rent pursuant to the Lease was as follows:

| Lease Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| Expansion Premises Commencement Date - 7/31/07 | $802,383.36 | $66,865.28 |
| 08/01/07 - 01/31/08 | $824,094.00 | $68,674.50 |
| 02/01/08 - 01/31/09 | $831,345.36 | $69,278.78 |
| 02/01/09 - 05/31/09 | $838,597.08 | $69,883.05 |
| 06/01/09 - 06/31/09 | $853,070.40 | $71,089.20 |
| 07/01/09 - 06/30/10 | $858,815.16 | $71,567.93 |

[3]Tenant's Proportionate Share of Operating Expenses is a term defined in the Lease as 20.91%. (Am. Complaint Ex. A p. 2.) Exhibit B to the Lease Agreement sets forth examples of Operating Expenses. (Am. Complaint Ex. A p. 14.) DCT asserts that the proportionate share of Operating Expenses owed by DEX is 100% at the time of the breach through the remainder of the term. (Pl. Mot. for Summ. Judg. P. 6.)

[4]The Lease provides that "monthly installments of Base Rent and Estimated Operating Expense Payments will be due and payable in advance on or before the first day of each calendar month during the Lease Term. Each such installment will be paid to Landlord at Pizzuti" either by check or electronic funds transfer. (Am. Complaint Ex. A p. 3.)

Sue Bird, a DCT employee, sent an internal email to other officials at DCT stating "DEX stated they want out of the lease...Dex inferred that the full payment of January 2009 rent will be the last they pay." *Id*. at 3. This string of internal emails from DCT also included calculations about the net operating loss ("NOL") for DEX:

> The actual NOL hit for this tenant would be a negative $-85,972. This is mainly SL Rent and outstanding AR offset by a security deposit. There would also be an additional negative below NOI hit of $-188,851 for a lease commission and an intangible asset associated with the tenant.
>
> The amounts above do not include the hit against budget for future rents, cams, etc.

(Def. Supplemental Memo in Opp. p. 3.)

DCT sent past-due rent notices to DEX in February and March of 2009. On March 9, 2009, DEX sent a letter to DCT stating:

> As I'm sure you are aware, Data Exchange Corporation (DEX) has completely moved out of the Premises. We acknowledge the notices sent from the Pizzuti Companies about the non-payment of rent for February and March, the latest one received today. I thought I made it clear in my telephone conversation with Cannon Green in February that DEX would not be paying any further rent and is surrendering the Premises to the owner. To avoid any doubt, please be advised that DEX has surrendered the Premises and will have no further occupancy thereof. If you believe you have been damaged in any way by such action, you should immediately take all steps necessary to mitigate same.

(Aff. of Kelly Bystrek Ex. D.)

DCT asserts that after it received the March 9, 2009 letter from DEX it retained Pizzuti Management, LLC ("Pizzuti") to market the Premises for lease.[5] According to DCT, Pizutti

---

[5]Pizzuti appears to have been involved in the Lease with between DCT and DEX from inception. Pizutti's address in Columbus Ohio is listed as the Address of Landlord in the Lease Summary. (Am. Complaint Ex. A p. 2.) On May 19, 2006, DCT and Pizzuti executed an Exclusive Right to Lease Listing Agreement, which provided that Pizzuti would be the Broker for certain DCT property located in Franklin County Ohio, including the Premises. (Aff. of

marketed the Premises for rent "at terms similar to or more favorable than those contained in the Lease." (Pl. Mot. for Summ. Judg. p. 6.) These efforts resulted in at least six showings of the Premises.

On September 18, 2009, DCT executed an Agreement of Lease with System Design Advantage, LLC ("SDA"), whereby SDA agreed to lease from DCT a portion of the Premises for a term beginning on October 1, 2009, and ending on February 28, 2015 (the "SDA Lease").[6] The SDA Lease provides that SDA will initially lease 101,429 square feet through January 2011, after which it will lease an additional 28,786 square feet through the remainder of the SDA Lease term.

On October 29, 2009, DCT executed an Agreement of Lease with Buckeye Diamond Logistics, Inc. ("BDL"), whereby BDL agreed to lease from DCT the remaining portion of the

---

William Baumgardner Ex. A p. 1.)

[6]Base Rent is defined in the SDA Lease, and varies according to the lease period:

| Months: | Annual Rate per Rentable Area: | Monthly Rate: |
|---|---|---|
| March 1, 2010 - January 31, 2010, inclusive | $2.75 p.s.f. | $23,244.15 |
| February 1, 2011 - February 28, 2011, inclusive | $2.75 p.s.f. | $29,840.94 |
| March 1, 2011 - February 28, 2012, inclusive | $2.85 p.s.f. | $30,926.06 |
| March 1, 2012 - February 28, 2013, inclusive | $2.95 p.s.f. | $32,011.19 |
| March 1, 2013 - February 28, 2014, inclusive | $3.05 p.s.f. | $33,096.31 |
| March 1, 2014 - February 28, 2015, inclusive | $3.15 p.s.f. | $34,181.44 |

(Aff. of William Baumgardner Ex. B p. 1.)

Premises for a term beginning on October 19, 2009, and ending on October 31, 2010 (the "BDL Lease").[7] The BDL Lease provides that BDL will lease 144,483 square feet for the entire BDL Lease term.

## B. PROCEDURAL BACKGROUND

On April 8, 2009, DCT initiated the current action in this Court. On June 3, 2009, DCT filed an Amended Complaint alleging two causes of action: (1) an action for rent under the Lease for the months of February, March, April, May, and June of 2009; and (2) anticipatory breach by DEX for the remainder of the Lease period from July 2009, until July 2010. DCT wants this Court to: (1) enter judgment against DEX pursuant to Count I of the Amended Complaint and award DCT an estimated $405,194.35 to DEX for past due Base Rent, Operating Expenses, amortized capital improvement costs and late fees for the months of February 2009 through June 2009; (2) enter judgment against DEX pursuant to Count II of the Amended Complaint and award DCT an estimated $1,082,636.86 in rent and other fees for the months of July 2009 through July 2010; (3) award DCT prejudgment and post-judgment interest at the statutory rate; (4) award DCT costs associated with this action in accordance with section 23 of the Lease; and (5) award DCT all other relief to which it is entitled. (Am. Compl. Doc. 9 pp. 3-5.) On June 17, 2009, DEX filed its Answer and Counterclaim, asking this Court to order declaratory relief against DCT and hold that DCT is bound by its selected remedy and can pursue only the remedy

---

[7]Base Rent is defined in the BDL Lease as:

| Months: | Annual Rate per Rentable Area: | Monthly Rate: |
|---|---|---|
| 1 through 12, inclusive | $2.03 p.s.f. | $24,441.71 |

(Aff. of William Baumgardner Ex. C p. 1.)

contained in Section 22(a) of the Lease. (Answer and Counterclaim Doc. 11 p. 5.)

On September 30, 2009, DCT filed a Motion for Partial Summary Judgment on its Complaint and for Summary Judgment on DEX's Counterclaim. DCT asks this Court to rule that: (1) DEX is liable for breaching the Lease from February 2009 through the remainder of the Lease term; (2) DCT is entitled to damages accruing through September 2009; and (3) DEX is not entitled to declaratory relief. On October 26, 2009, DEX filed its Response in Opposition to DCT's Motion for Summary Judgment and in the Alternative, Motion Under Rule 56(f) for an Extension of Time to Respond to the Motion for Partial Summary Judgment. On November 30, 2009, Magistrate Judge Kemp issued an Order granting DEX's Rule 56(f) Motion. (Doc. 25.) Pursuant to Magistrate Judge Kemp's Order the Parties conducted additional discovery and on February 15, 2010, DEX filed a Supplemental Memorandum in Opposition to DCT's Summary Judgment Motion. DCT's Motion for Summary Judgment has now been fully briefed, orally argued, and is ripe for decision.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(C). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart*

*v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P.56(e)(2); *see Celotex*, 477 U.S. at 324; *Search v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. LAW AND ANALYSIS

### A. LIABILITY

Since February 2009, DEX has not paid to DCT rent for the Premises as is required by the Lease. DCT and DEX agree that beginning in February 2009, DEX breached the terms of the Lease. As to the issue of liability, there is no genuine issue of material fact in dispute; therefore, DCT is entitled to summary judgment and this Court finds that DEX is liable for breaching the Lease from February 2009 through the remainder of the Lease term, June 30, 2010.

### B. DAMAGES

Under Ohio law, a commercial lease is regulated not by statute or common law, but by the express terms of the lease. *Hendrix v. Eighth and Walnut Corp.*, 1 Ohio St.3d 205, 208 (Ohio 1982) ("[T]he terms in a commercial lease are left to the parties to negotiate between themselves. Thus, the relationship between the commercial lessor and lessee is not regulated by any statutory regulations...."). The Ohio Supreme Court has noted that certain contract-law principles are applicable to real property leases. *See Frenchtown Square Partnership v. Lemstone, Inc.*, 99 Ohio St.3d 254, 258 (Ohio 2003)(stating that on the narrow issue before the

court it was unnecessary to "explore the theoretical arguments that attempt to classify leases as conveyances of real property, as contracts, or as a hybrid of these two concepts"); *Dennis v. Morgan*, 89 Ohio St.3d 417 (Ohio 2000) ("As in any other breach-of-contract action, a plaintiff landlord must prove damages."). Additionally, where a contract "is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Davis v.Loopco Industries, Inc.*, 66 Ohio St.3d 64, 66 (Ohio 1993) (citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (Ohio 1978)). When, however, "a term cannot be determined from the four corners of a contract, [a] factual determination of intent or reasonableness may be necessary to supply the missing term." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. Of Ohio, Inc.*, 15 Ohio St.3d 321, 322 (1984).

Section 22 of the Lease sets forth DCT's remedies in the event of a default by DEX. (*See* Am. Complaint Ex. A pp. 6-7.) Section 22 provides in part, that DCT may:

> (a) terminate this Lease and all rights and interests of Tenant hereunder including Tenant's right of possession under this Lease and declare immediately due as liquidated damages, an accelerated lump sum amount equal to the amount by which Landlord's commercially reasonable estimate of the aggregate amount of Base Rent, Tenant's Proportionate Share of Operating Expenses and other charges under this Lease owing from the date of termination through the scheduled expiration date of the Lease Term, plus Landlord's commercially reasonable estimate of the aggregate expenses of reletting the Lease Premises...,exceeds Landlord's commercially reasonable estimate of the fair rental value of the Leased Premises for the same period (after giving effect to the time needed to relet the Leased Premises) both discounted to present value...; or (b) terminate Tenant's right of possession of the Leased Premises without terminating the Lease and re-enter and attempt to relet the Leased Premises, in which event Tenant will remain obligated to pay to Landlord any deficiency between all sums payble by Tenant pursuant to this Lease and any sums collected by Landlord from any reletting of the Leased Premises...Landlord will not, under any circumstances, be under an obligation to relet the Leased Premises or any part thereof.

*Id*. The remedies listed in Section 22(a) and Section 22(b) are in addition to "any other legal

rights and remedies available to Landlord at law or in equity." *Id*.

The Parties disagree as to the measure of DCT's damages arising from the breach. DEX argues that DCT can pursue either the remedy found in Section 22(a), referred to as the liquidated damages remedy, or the remedy found in Section 22(b), referred to as the common law remedy, to recover damages from DEX. DEX asserts that DCT has, in its pleadings, elected to pursue the remedy in Section 22(a); and that selection of the 22(a) remedy limits DCT's recovery. DEX further asserts that to the extent DCT requests rent for the months of October 2009 through June 2010, it is seeking accelerated rent, and accelerated rent is not an option under Section 22(b). DEX also argues that to the extent DCT is asking for rent for the months of February 1009 through September 2009, it is seeking back rent, and back rent is not an option under Section 22(a).[8]

DCT counters that it has not elected any specific remedy and has instead pled, as Rule 8(e) allows, all possible grounds under which it is entitled to recover. Rather, DCT argues that it can pursue the present action for the periods in which DEX has already failed to pay pursuant to the Lease in an action for rent, and that it can pursue an action for anticipatory breach for the future months for which DEX has stated it will not pay rent. DCT asserts that Section 22(a) of the Lease is only applicable when the Lease is terminated; and the Lease with DEX has never been terminated. Instead, DCT terminated DEX's right of possession without terminating the lease. Further, DCT argues that Section22(a) requires that DCT "declare immediately due as liquidated damages, an accelerated lump sum" and that DCT has never done this or made any

---

[8]At Oral Argument, DCT argued that to recover both past rent and accelerated rent DCT could wait until the end of the Lease period and sue for the entire amount of damages.

such demand for that amount from DEX. (Pl. Reply Doc. 22 p. 6.) DCT is seeking relief only under Section 22(b), which it argues is the same as "any other legal rights and remedies available" at common law that it is entitled to pursue under the terms of the lease. (Am. Complaint Ex. A pp. 6-7.)

The language of the Lease does indicate that DCT may pursue either the remedy found in Section 22(a), a liquidated damages remedy, or the remedy found in Section 22(b). Section 22(b) allows DCT to collect any "deficiency between all sums payable by Tenant pursuant to this Lease and any sums collected by Landlord from any reletting of the Leased Premises." (*See* Am. Complaint Ex. A pp. 6-7.) DCT has elected to pursue the damages remedy found under Section 22(b) as it is allowed to do under the Lease. (Pl. Reply Doc. 22 p. 6.) Federal Rule 8(d)(3) allows that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). DCT is allowed to plead all claims against DEX under which DCT might be entitled to relief. DEX is not entitled to declaratory relief that DCT has elected to pursue the damages remedy found under Section 22(a) and is bound by that election under the doctrine of election of remedies. DCT is therefore entitled to summary judgment on DEX's Counterclaim.

### 1. Rent for February 2009 through September 2009 [9]

DCT argues that DEX has failed to fulfill its obligations under the Lease to pay rent for

---

[9] DCT states that it is not requesting judgment for rent due for the months of October 2009 through June 2010 (the remainder of the Lease) because that figure is not yet known. (*See* Pl. Mot. for Summ. Judg. P. 4) ("Numerous factors may impact Defendant's liability for rent for such months, such as: DCT's income, if any, from re-leasing the space to other tenants during the Lease term; DCT's costs to prepare the space for re-leasing and the costs associated with mitigation efforts; the final operating expense amounts for 2009; and DCT's attorneys' fees in connection with this matter, for which Defendant is liable under the Lease.").

the months of February 2009 through September 2009, and is liable for such failure. According to DCT, DEX's total rent obligation for this period is $668,527.64.[10] DCT has not provided evidence or affidavits documenting how it arrived at this total sum. Indeed, its calculations include figures according to the categories of Base Rent, Operating Expenses, Tenant Improvements, and late charges; but again, there is no verification as to the source or validity of those figures.

The Premises were not re-let by DCT to SDA and BDL until October of 2009. To the extent that evidence supporting the figure requested by DCT is provided, DCT may be entitled to that amount in damages from DEX. As DEX has raised the affirmative defense that DCT failed to mitigate damages, discussed below, the Court cannot grant summary judgment on the amount of damages owed by DEX to DCT for the period of February 2009 through September 2009.

## 2. Mitigation of Damages

---

[10]DCT asserts that this figure represents the total of:
(1) $564,124.39 for Base Rent for these months, which Defendant is
required to pay under Section 3 of the Second Amendment to Lease; plus
(2) $95,261.28 for the Operating Expenses owed for those months, which
Defendant is required to pay under Section 2 of the Lease; plus
(3) $4,633.36 for the amortized portion of Defendant's Tenant
Improvement costs for the Premises for those months, which Defendant is required to
pay under Section 7 of the Second Amendment to Lease; plus
(4) $32,969.02, representing a five percent (5%) late charge on the past
due Base Rent and Operating Expense payments, which Defendant is required to
pay
under Section 3 of the Lease; minus
(5) $1,173.18, which Defendant is credited for overpayment of 2008
Operating Expenses pursuant to the reconciliation performed earlier this year; minus
(6) $27,287.23, which Defendant is credited for the amount of its security
deposit remaining on deposit with DCT.

DEX argues that DCT did not take reasonable steps to mitigate damages as DCT was required to do by law. Specifically, DEX argues that despite becoming aware in January 2009 of DEX's surrendering of the Premises, DCT took no action to mitigate damages until March 2009. Additionally, DEX asserts that when DCT put the Premises on the market, they were listed at too high a price, meaning that the property was less likely to attract interest than it would if the listing price were more competitive. (*See* Decl. of Tom Devitt Doc. 27 Ex. F.) DEX also argues that damages should take into consideration that SDA received five months of free rent,[11] and that, for purposes of the damages calculation, the rent funds received from SDA during the SDA Lease term should be allocated to cover all of the months when SDA was legally permitted to be in the Premises.

DCT argues that its actions in: (1) retaining Pizzuti, a reputable commercial brokerage to market the Premises; (2) offering the Premises at a similar rate to what DEX was paying under the Lease; and (3) previewing the premises, together demonstrate the reasonableness of DCT's mitigation efforts. DCT further asserts that reasonableness in its mitigation efforts is shown in that the Premises have now been re-let.

Landlords have a duty to mitigate damages caused by a breaching tenant. *Dennis*, 89 Ohio St.3d at 394 ("Landlords mitigate by attempting to rerent the property."). This "duty to mitigate damages applies to all leases. *Frenchtown*, 99 Ohio St.3d at 259 ("We see no valid reason to exempt commercial leases from the duty to mitigate."). The Ohio Supreme Court has stated that the reasonableness of efforts to mitigate damages is normally an issue for the trier of

---

[11]The SDA Lease provides that SDA will start paying rent to DCT in March of 2010. (*See* Aff. of William Baumgardner Ex. B p. 1.)

fact where there is evidence presented on both sides of the issue. *Frenchtown*, 99 Ohio St.3d at 259 (remanding case to trial court on issue of mitigation and to determine damages); *Dennis*, 89 Ohio St.3d at 394 (stating that a Landlord's "efforts to [mitigate] must be reasonable, and the reasonableness should be determined at the trial level"). Here, a genuine issue of material fact exists as to the reasonableness of DCT's mitigation efforts. Therefore, summary judgment is inappropriate. Since the failure to mitigate is an affirmative defense applicable to the issue of damages, this Court cannot determine damages at this time.

## V. CONCLUSION

For the foregoing reasons, DCT's Motion for Partial Summary Judgment on DCT's Complaint and for Summary Judgment on DEX's Counterclaim (Doc. 17 ), is **GRANTED in part and DENIED in part**. DCT is entitled to summary judgment in its favor on the issues of: (1) liability of DEX for breaching the Lease; and (2) on DEX's Counterclaim for a declaratory judgment. DCT is not entitled to summary judgment on the rent owed for February 2009 through September 2009 because a genuine issue of material fact exists as to the reasonableness of DCT's efforts to mitigate damages.

**IT IS SO ORDERED.**

                                          <u>s/Algenon L. Marbley</u>
                                          **ALGENON L. MARBLEY**
                                          **UNITED STATES DISTRICT COURT**

**Dated: March 16, 2010**